of America. Ms. Shapiro, you have two minutes reserved for rebuttal. Whenever you're ready, you may proceed. Thank you, Your Honor. May it please the Court, my name is Alexandra Shapiro, and I represent Mark Johnson on this appeal. Speak as loudly as you can, please. Okay. Sorry, Judge. The dispositive issue in this appeal is whether the government's misappropriation theory of fraud was legally invalid. The government does not dispute that quorum nobis should be granted and Mr. Johnson's conviction expunged if a fiduciary or similar relationship was foreclosed by law, and it was in this case. The government's misappropriation theory was that HSBC couldn't buy pounds ahead of the fix because it had a duty of trust and confidence that such foreign exchange trading would violate. But HSBC had to buy pounds to carry out the transaction, and the contracts governing the transaction expressed If misappropriation should not have been, wasn't there, then wasn't the earlier panel incorrect in sending it to the jury together with the control theory? I mean, they did send it. Sorry, the earlier panel? The previous panel on which I sat. Correct. Sent both the control theory and the misappropriation theory to the jury. Respectfully, Your Honor, if I may, what happened was that the district court in the first trial sent both theories to the jury and then this court affirmed solely based on the right to control theory. We said we're not taking a stand on whether the misappropriation theory should have been sent. Correct. But if it was error for it to have been sent, shouldn't we have reversed anyway? Well, I suppose at least conduct a harmlessness analysis with respect to then-extant right to control theory. That was actually my argument. I remember. The court rejected that because the court held that, and I think this was under Griffin, that because the court found that the evidence was sufficient under the right to control theory, that it didn't matter whether the misappropriation theory- Even if the other thing was wrong, it was so obvious that the jury decided on the control theory that we didn't need to reverse or decide about the misappropriation theory. Correct, Your Honor. Okay. And then we-and so the reason we're back here now after Mr. Johnson completed his sentence and he's seeking coram nobis relief is that the Supreme Court ruled in Simonelli that the right to control- Because now you are arguing that either it shouldn't have been sent of a misappropriation theory at all or that in this case the misappropriation theory is sufficiently dubious that the error on the other is not harmless. Either way, you win. But you can make it either way. That's correct, Your Honor. That is exactly the nub of our argument. Can I ask, if I think about the misappropriation theory, you may agree or disagree, but turning on the question of the merger clause ultimately and so whether or not the duty to keep the material confidential in the predating confidentiality agreement continues. So are you tracking the set up? I think so, Your Honor. Is that question-I mean, I know what your answer will be, but I'm trying to figure out in my own mind whether it's a legal or factual question. That is to say whether the merger clause in the ISAD- ISDA. ISDA. I constantly do that. Extinguishes any existing duty to maintain the information in confidence. Is that a legal question or a factual question? Well, I think it's the legal question. As I said, I know what your answer is, but I guess the why is the important question. I think it's a legal question, but I just want to step back for a minute. I think it's important to remember that the purpose of the NDA was to analyze the transaction at the stage when Karen was trying to choose a bank. It would not have made sense ever for once Karen chose a bank and chose to engage in a transaction for whatever bank it chose not to be able to-the only confidential information here really is about the timing. You know, they placed the order, and you don't want other banks to know that they're executing the order. So there's no way to execute the order without using the fact that, you know, you know that they've placed the order. And I'm not sure if that's- Well, I mean, that sounds like a-in a way, your answer to my question, that sounds like a good factual argument. Well, I should take a step back and say I don't actually think it matters, in part for the reasons that Judge Calabresi articulated, which is that either it shouldn't have gone to the jury at all or- Well, I guess it's the or. So I'm trying to do the or in my head. And what-so if it's a-so we're already in the-it's not-it shouldn't have legally been kept from the jury. So factually it should have been kept for the jury. And so then I think about, well, what factually might the jury have relied on in concluding if they did, which we don't know. But if they were to have based a decision based on the misappropriation theory, what factually might they have looked to? And if it's just whether there was a continuing duty of confidentiality because there was a confidentiality agreement, for example, that sort of gives one notion of what the evidence was in front of the jury, from which they might have made a misappropriation determination. Well, I think the-and I apologize. I don't think I'm being clear enough. But I think the reason that wouldn't make any sense in this particular context of FX, execution of a fixed transaction, is that by definition the bank has to use the-it has to execute the order. It has to purchase pounds ahead of the fix. The misappropriation theory was developed. And I'm not saying it doesn't make sense in some contexts outside of insider trading of securities. But the idea behind it is that, you know, you've got a duty of confidentiality to a client, let's say, a law firm, for instance, like the O'Hagan case. You can't go out and start buying a stock because you know that the client is about to purchase a public company. This is very different because the entire purpose of the relationship is to carry out this transaction, which requires the bank in an enormous transaction like this to go out and buy the pounds. But the violation, the idea behind misappropriation is that you're misusing the information. And so here there's no misuse of the information. And the agreements make clear that the party's understanding was that there was no fiduciary or similar relationship. They were both principals. HSBC wasn't an agent. And that's why-and I want to highlight this. I know we discussed it in our briefs and you've seen the ACI amicus brief. But ACI has filed an amicus brief not only at this stage, but it filed an amicus brief with the first panel. It filed an amicus brief in support of our cert petition. And I think that's very important because that's the industry. It's 61 member organizations around the world, including central bankers. And they're telling this court that the way this industry works, in this kind of a transaction between arm's length counterparties, that there's a background norm here that everyone understands, that the bank does not have this kind of a duty for this type of transaction. And, you know, indeed, as the brief points out, when Dodd-Frank was enacted, Congress- You don't need to go that far. Correct, Your Honor. Because you're saying that even if a jury could find that there was a duty, what the previous panel, in effect, said, this case stands on control and the other doesn't affect it because control is so obvious. So when you remove control, it becomes difficult to say that finding of this is sufficiently clear that it wasn't affected by the previous holding. Absolutely, Your Honor. But obviously we have a member of the previous panel. I read that opinion, perhaps wrong, that the court was saying as long as there's one theory that's valid, we don't need to reach the second theory and determine its validity because we find one theory as valid, even though the jury was instructed on both and was not asked on which theory they would base their conviction. So is there a plausible reading of the opinion as skipping, if you will, taking the easier path and not addressing the other issue, the misappropriation theory for liability or for guilt? Your Honor, I defer to Judge Calabresi as to what the panel was thinking, but it seems clear from the opinion that the panel did not decide misappropriation. I would point out that even the district court admitted during the trial and again below in this proceeding that this was a naughty question. This court also granted bail for Mr. Johnson. Judge Calabresi was on that panel and clearly found at that time that it was a substantial question. The Second Circuit's opinion specifically does hold that Mr. Johnson was not convicted of, quote, unquote, front running. And front running is the essence of the misappropriation theory. The misappropriation theory was that the confidential information was supposedly misused to trade ahead of the fix. And this panel said, and it was important to its holding and rejecting our due process argument, that Mr. Johnson was not convicted of front running. And I'm not, I understand your argument on that point, and I don't mean to, and I understand you don't need to reach what you're now saying is you don't need to reach the question that you framed at the outset of your argument, which is this entire case rests on whether there was a fiduciary duty to support a guilty verdict for misappropriation. But getting to that point, and I understand the question of whether it's a legal question or a question of fact, it seems like the district court on the Korob-Nobis petition didn't focus on the confidentiality agreement the way the government wants it to here before us in their argument. But the court did say, look, notwithstanding that we're not a fiduciary in the ISDA and those provisions, that it is a fact, it seemed to say it's a factual question whether a fiduciary obligation nonetheless existed between Mr. Johnson, the bank, and Karen. Can you address that question, whether that would be assuming, notwithstanding the provision that it's not a fiduciary relationship, would that be a question of fact or a legal question? Well, I think, again, I mean, our position is that it's a question of law. But alternatively, even if it was a question of fact, the harmless error analysis is clearly in our favor. This is a case where, and the government doesn't even talk about this in its brief, where it expressly told the jury that there were two theories. All they had to find was one and highlighted the particular instructions relating to the right to control. Given that and all the other factors, including the ISDA, including all of the arguments I made to this court, demonstrate that it was clearly, at a minimum, a close question. And there can be no assurance that the jury relied on that, as opposed to the simpler and more straightforward right to control theory that this court relied on in affirming the conviction. So as to if we do get to the question that you laid out up front, you're also saying the panel's first, the first decision by the panel and all the circumstances surrounding it and the knotty issue of whether there was a valid claim for misappropriation still apply? Correct, Your Honor. Yeah. And I guess what I'm trying to make clear is I think we win either way. Either it's a legal question and then the court should rule in our favor for the reasons I stated, and I think my opponent doesn't disagree that if you agree with that, that that's the result. Or if it's not a legal question and it was proper to send it to the jury, the error was not harmless under the governing standard. On the standard for quorum novus, so where do you sit under the government standard? How would you articulate the quorum novus standard? So this court has expressly, I guess, refused to expressly decide whether in a Federal collateral proceeding, as opposed to a State habeas, what the standard for harmless error is. It has applied in Collotti and Stone and some other cases essentially the Chapman standard, whether a properly instructed jury would have convicted the defendant beyond a reasonable doubt. I think we win either way, whether that's the standard or not. We have never decided which of the two standards should apply here, but your argument is that on this particular fact situation, under either of these standards, this error can't be harmless. Correct, Your Honor. I think you don't need to resolve that question, because we would win under ISA. But that's a very interesting and difficult question. It is, and it's one I hope you don't have to produce. Although I think we have the better answer. Are you suggesting that because it's so clear, this isn't the appropriate case for us to tackle that question? I think it's unnecessary, and so the Court should probably wait for a case that actually turns on the – where the outcome turns on the standard. All right. You do have time for rebuttal. Thank you. Shapiro. Mr. Lang. If you'll bear with me. You could raise the podium, if you like. Oh, thank you. Way, way up. I've had this problem before, Your Honor. That might be as high as it goes. How's the volume? All right. Thank you. Good morning, Your Honors, and may it please the Court. Andrew Lang for the United States. The district court correctly denied Johnson's quorum nobis petition, because he failed to show that the Simonelli error at his trial was not harmless, in light of the ample evidence supporting the misappropriation theory of fraud. But how can you say that, given that the previous panel said we don't need to decide whether there was evidence, because the other is so strong that that's enough? Now, isn't that a holding of our court, either that the misappropriation theory shouldn't have been sent, or even if it was sent, it was harmless because it was so obvious that it decided under control theory? Well, of course, Your Honor knows the prior panel's opinion better than I do, but I understand the prior panel's opinion to be narrowly focused on the sufficiency of the evidence with respect to the right to control theory, and simply skipping past the misappropriation theory. This Court said explicitly we need not and do not consider Johnson's arguments with respect to the misappropriation theory. So I think the prior panel took the understandably expedient route. But, I mean, that could mean we don't. I guess whether the panel was required to engage under Griffin, I guess, under some kind of analysis that the right to control theory was a sufficiently strong claim, or there was sort of sufficiency plus evidence with respect to it, that therefore we don't need to engage. And maybe that was what now I'm understanding and hadn't appreciated before argument, but maybe that was an implicit step in the prior panel's analysis, which would inform at least our analysis of harmlessness now. I think that's consistent with my reading of the prior panel's opinion. If that is so, don't you have to say to us, in fact, the misappropriation theory is sufficiently strong so that the fact of giving both is harmless? That is, the prior panel said the control theory is strong enough so that we don't worry about the misappropriation theory, although we might if the control theory were not strong enough. So you have to do the opposite and say the misappropriation theory is so strong that the jury decided it on that basis, period. Is that what you have to argue? So a couple of responses to that, Your Honor. So first of all, I basically agree with the premise of Your Honor's question, that now that Simonelli has knocked the right-to-control theory off the table, this Court does have to determine whether there was enough evidence to support the misappropriation theory. First, whether there was enough evidence to send it to the jury at all. And second, if there was enough evidence to send it to the jury, that that evidence was strong enough so that when we don't know which of the two they decided on, as a theoretical matter, as a practical matter, we can say they did it on the misappropriation. Yes, I think that's basically right. The point that I want to stress, however, is that we are in a quorum novus posture. So, in fact, it's not the government's burden. It's the movement's burden to demonstrate that there was a fundamental error justifying the extraordinary remedy of quorum novus. So Johnson has the burden to show the absence of harmlessness, so to speak. Not only that, but, of course, on appeal, to the extent that the district court is making other than two. Well, you cite O'Neill, and O'Neill says if it's in equipose, then it's not harmless. Well, I think the evidence at trial was ample in support of the misappropriation theory. Okay, go ahead. So give us ample. Sure. So I think there were roughly three categories of evidence that support the conclusion that there was the requisite duty of trust and confidence under Chestnut. One of those categories of evidence is the written confidentiality agreement. But then why did the prior panel not go out of its way to say we don't need to decide the misappropriation? That is, if, in fact, both were there, one would have thought the previous panel would have said, yeah, the misappropriation theory was there, the control theory was there, and at least as to one of them, it's perfectly obvious. But the previous panel did something rather odd. It said we don't need to think about misappropriation. Well, I wish I had more clairvoyant insight into the prior panel's decision-making. But I will say that the prior panel's opinion I don't think can be read as really passing at all on the validity of the misappropriation. And I understand that argument. Okay, let's assume, you know, a person who's not clairvoyant or was not in the room when the decisions were made doesn't know and reads the opinion and says, hey, they just went with one that seemed obvious and skipped on the other. Let's assume, though, do you concede that a plausible reading that your opponent is making is that the panel, without the benefit of clairvoyance or participation, said, you know, we're going to take the low-lying fruit because this is easy and it's obvious? Because the other one is not so easy because the issue of a fiduciary duty is, in the words of the district court, a naughty issue. Do you concede that? A couple of responses to that, Your Honor. So my first thought is it is possible that that is why the prior panel did what it did, but I don't think it is possible for this court to really draw any content from the prior panel's opinion with respect to the misappropriation. There is some importance, even if we were to decide against you, how you decide that, because if we decide that the misappropriation theory should not have been sent to a jury, that's the end of the case. If we decide that this was sent but this was not harmless error, then in theory, at least, you could retry the guy. I agree with all of that, Your Honor. I think that's a possible outcome here. I mean, I'm not interested in whether you would do it or not because I'm only interested in our legal structure. But from our legal structure, if we said, look, the question of misappropriation is a hard one and we cannot say that in this case the Simonelli error was harmless, then you could, if you thought that the evidence was strong enough, go after him. I think that that's right, although this may be getting us down a quorum nobis rabbit hole that we don't need to enter. But I would observe at least the Third Circuit has held in a precedential opinion that the writ of error quorum nobis is categorically unavailable for the kinds of errors that would lead to a new trial. That's United States v. Stoneman at 870 F. 2nd 102. The reason being that quorum nobis is reserved for errors of the most fundamental character that render the result of a trial unreliable. And, of course, at quorum nobis, the presumption is that the trial was reliable and free of error. So I do want to spend some time emphasizing the height of the hurdle that Johnson has to surmount in order to achieve quorum nobis. Because, essentially, the error in trial was one that this person didn't know. I mean, Simonelli came down when he was still in jail for a few days, but realistically he could not have brought habeas. So that we only... And he did bring it on direct and the panel didn't address it. Or they may have implicitly addressed it, as I now understand. Of course. I agree with all that. Again, I emphasize I don't think the panel's opinion can be read as implicitly passing on the validity of the misappropriation theory. But it is. I mean, it is a quorum nobis by accident of timing and accident of... Accident of timing of the Supreme Court invalidating right to control. Accident of timing or accident of whatever of it not being resolved on direct appeal. It feels... I don't know if there's a sort of doctrinal reason for thinking that it ought to be more like a habeas standard if, in fact, quorum nobis is something more stringent. But I don't know why this would be a case for reaching that conclusion. So I don't think... I actually agree with my colleague. I don't think that this is a case where the court needs to decide the different standard that might be applicable to quorum nobis or 2255. In our view, that's because we would be successful under either of those standards. I do want to briefly address the... If I may have a few minutes. The standard... I'm sorry I didn't hear. Oh, I'm sorry. I'm sorry, Judge Calabresi. I want to address the standard for harmlessness. So my colleague, of course, argues that the Chapman standard is applicable on quorum nobis. Respectfully, I would suggest that my colleague is misinterpreting Stone and this Court's other cases that are cited in the reply brief. Stone is a 2255 appeal in which, in fact, this Court applies the substantial and injurious effect standard from Brecht. Colati does the same thing. So it's true that Kassir acknowledges that there's some debate, but Stone, in fact, in a footnote, cites Wright and Miller for the proposition that the Chapman beyond a reasonable doubt standard applies on direct appeal, whereas the Brecht substantial and injurious effect standard applies on collateral review. Additionally, as a general matter, for the reasons spelled out in our brief and as reflected in the Eleventh Circuit's unpublished opinion in Spilici and in the First Circuit's opinion in George, that standard is more appropriate for quorum nobis relief, whether or not it may be a happenstance that we're here in this posture, because we're at the far end of the spectrum in terms of the interest in finality and the height of the hurdles that movements generally have to surmount. Now, let me just put this to you. Assuming that there is a decent argument that either one was violated, that either one, for us to make that decision and to put the decision on the basis of which of these is, given the difficulty of that issue, asking for somebody to go to the Supreme Court and reverse us because we picked the wrong one and have this case and this guy who claims that he is suffering from this for a long time still be. So that, you know, just from a practical point of view, I'm not saying that we can, if the issue is in fact there, then we have to decide it. But this is a case we're all considering. If we can decide it without deciding that, maybe the more sensible thing to do. And as I believe I mentioned a few minutes ago, we agree that this court can decide this case without deciding the harmlessness standard that applies to Coram Novus cases. Again, because I think Johnson fails to satisfy his burden under either Chapman or Brecht. I was in the middle, Your Honor, of answering Your Honor's question about the ample evidence, if I might. Yeah, and just to set it up for me to do, right, the alternative analysis. So there's the argument that the jury should have legally been prohibited. But the alternative argument was even if there is sufficient evidence, it wasn't harmless. So then in my mind, I need to think about how ample was that evidence. And so that then leads me to the questions of are these sort of factual or legal questions, which ends up circling back to the first argument that we've moved beyond for purposes of the analysis. Absolutely, Your Honor. And I agree with Your Honor. That's how I see the flow chart as well. I'm happy if I made a start with the threshold question, whether it's legal or factual, before I get into the evidence of harmlessness. So first of all, I think the question that my colleague has identified, and we agree that this question is important, boils down to is it possible for a written agreement categorically to disclaim the kind of relationship of trust and confidence that is necessary under Chessman? The answer to that question is a resounding no. And that's true not only under this Court's precedent in Kaczynski, but that's consistent with the precedents of other courts, including Lupton and the Ninth Circuit's opinion in Milovanovitch. How about Wachovia? The Wachovia case? I have that in my head as counter to that principle. In what sense, Your Honor? I'm sorry. In that I think it sort of sets a balance on what can go to the jury on the question. So I think the issue here is whether or not the threshold question of the fiduciary relationship can be determined solely based on the, I'm going to call it the ISDA agreement, and the written disclaimer of fiduciary status. Again, I think at least in the context of criminal liability, in the context of the misappropriation theory, this Court has answered that question. So in Kaczynski, this Court looked at an agreement that labeled the defendant an independent contractor. And this Court, I think it's fair to say, did a totality of the circumstances analysis to understand that relationship and ultimately to find the requisite duty of trust and confidence. This Court explained, well, yes, the parties labeled each other in a certain way, but that's not the end-all, be-all. That's not the end of the analysis. And ultimately, it's still a question of fact, whether there was that relationship of trust and confidence. As the Seventh Circuit put it succinctly, and I think correctly, in Lupton, parties cannot contract around definitions provided in criminal statutes. And with all due respect to the amicus, I think it would be an anomalous and extraordinary result if this Court were to hold that a foreign contract boilerplate disclaimer were enough to insulate for all time a defendant from criminal liability. Okay, let's assume it was the ISDA disclaimer doesn't apply, does not defeat an otherwise fiduciary relationship. Let's assume it is a factual question. What evidence is there in the record to support, one, that there was evidence to go to the jury and then also, more importantly, evidence to support a finding by the jury that this was misappropriation through a fiduciary obligation versus the control theory? Yes, Your Honor. And that brings me, I think, to the second branch in the flow chart. So as I said a few minutes ago, I think that evidence can be roughly grouped into three buckets. So the first, as I mentioned, is the written confidentiality agreement itself. The confidentiality agreement supports the conclusion that HSBC owed a fiduciary-like duty to protect Karen's confidential information. The mandate letter and the ISDA agreement didn't deal at all with confidential information, whereas the confidentiality agreement defined confidential information very broadly, remained in effect for two years from October 2011. It was in effect at the time of the deal. So that, among other evidence, which I'll get to in a moment, supports the conclusion that there was this relationship of trust and confidence. The second bucket is testimony, not only from Karen but also from HSBC witnesses, including Johnson himself, reflecting a shared understanding that HSBC had an obligation to protect Karen's confidential information and to use it for the purposes for which it was provided. Karen's deputy head of legal, Duncan Holland, testified at page 79 of the supplemental appendix that the confidentiality agreement endured and HSBC was required to convert the currency. This was something that Karen needed guidance about. Karen's treasurer, Robert Scriven, testified at page 169 of the supplemental appendix that there was a, quote, duty of confidentiality, which is, I think, fairly black and white. HSBC salesman, Deepak Kot, talked about the concept of wall crossing. He testified that there was a wall and that certain HSBC employees, including himself and Johnson, were on the confidential side. There were certain people at HSBC who had an obligation, quote, to keep that information confidential and not to use it for any purpose other than what it was intended for. The information was to be used to learn how to execute the FX transaction and then to execute it. Finally, Johnson himself, at page 217 of the supplemental appendix, testified that the manner and the timing of the transaction were confidential and that it would have been impermissible to trade on it. So I think that category of evidence powerfully demonstrates, again, a shared understanding among individuals, including Johnson, that there was an obligation to protect this information. Third bucket, briefly. Third bucket, briefly, Your Honor. The structure of the deal. And I mention this because this is the kind of fact that this Court looked to in Kaczynski as well, the overall nature and structure of the relationship. As HSBC's proposal in response to the RFP reflected, they committed to avoid excessive market volatility, to mitigate any sudden FX moves against Cairn. Johnson testified that he was horrified, or rather he stated in a conversation that he was horrified at the prospect of an FX transaction involving ramping the fix, which of course is what he ultimately ended up doing. So the overall nature of the relationship reflects that Cairn needed the expertise of a bank because they weren't comfortable executing a transaction like this on their own. They relied on HSBC's discretionary use of their confidential information to execute this FX transaction in Cairn's best interest. Thank you, Mr. Lang. Thank you, Your Honor. We'll hear rebuttal. You can bring down the podium if you need to. Okay. Thank you, Your Honor. Just quickly to reiterate. Speak loudly. I'm sorry. To reiterate, it doesn't matter which standard you apply. Either way, the error was not harmless. I want to make really two points. One, a legal point. My colleague is, I believe, misreading the Kaczynski case and its application here. To the extent that, first of all, to the extent that Kaczynski can be read to endorse a sort of amorphous standard that depends on, is very heavily fact-dependent, that type of a standard has been rejected by the Supreme Court unanimously in the Prococo case. So that's number one. Number two, Kaczynski was a very different case. The Court highlighted that the context there involved securities trading where there's an SEC rule, 10b-5-2, in play. It involved a doctor and a drug company that was relying on the doctor to provide independent advice. The Court emphasized that the doctor did not comply with an obligation under the same set of contracts to disclose that he had more than $50,000 worth of stock. It was a very different case, different context, completely inapposite. With respect to my colleague's, on the other side's, discussion of the facts, first, with respect to the NDA, there is no evidence in the record that Mr. Johnson ever breached the confidentiality agreement in the sense of disclosing the confidential information to anyone outside HSBC who was involved. Would using it to sort of gain an inappropriate advantage be considered? That is not what happened. We are looking now at the factual record. I understand your argument. You said earlier in your direct argument this was not front-running. So I guess I have a question. Do you believe that there can be front-running even when it's a fixed transaction like this? I think in this context there isn't because of the regulatory background and the ISDA and the global code and all these other things. I don't think that that really exists here. No, no, no. I get that your argument is it doesn't exist here. My question was broader. My question is do you think that there could ever be front-running in a situation where there is a fixed transaction, an agreement for a fixed transaction? It's a different question. Yes, I understand now, Your Honor. You could have, for instance, a situation like that for a retail customer where the bank is, in fact, the agent of the customer or something like that. Obviously that's not the scenario that we have here. And I think the materials we put in our supplemental reply appendix demonstrate that the pounds that were purchased in connection with this transaction basically all went to fill Karen's order. So I think that's really critical. With respect to the testimony that my adversary mentioned, I think it was misconstrued a bit. I just want to be clear. What Mr. Johnson testified to was that he understood there was a confidentiality obligation and that they couldn't share the information outside the bank or not use it in connection with the ‑‑ what he said is that you couldn't use it, quote, if the trade's in connection with the execution. And that's at supplemental appendix page 218, trial transcript 2187. And so that's the point here. It was used in connection with the execution, and that was perfectly legal. Lastly, with respect to the structure of the deal, I just want to highlight again that the nature of the deal was that Karen had obligations too, and it had an obligation to give two hours advance notice. And had it done so, it probably would have resulted in a lower exchange rate for Karen. But for its own reasons, it did not. It initially placed a small order, I think, about an hour and 40 minutes before the fix and only made the bulk of the order about 30 minutes before, and that was what led to the pressure on the price. So if you look at the structure of the deal, it doesn't actually favor the government's position. But taking a step back, and more importantly, under either harmless error standard, it's clear that at a minimum this was a close question, and as we've discussed with respect to the prior panel's decision, the right to control was low-hanging fruit. It was also low-hanging fruit for the jury, and that's why given all the complications with this other theory, even if one gets past the legal arguments we've made, there's just no way under either harmless error standard this court could confidently conclude that the error was harmless. Can I just ask very briefly, do you have a view of the import of the Wachovia case? It might have been in the amicus brief. I'm not sure. Your Honor, we did cite it, and we cited a number of other cases that are, I think, similar. And I think our position clearly is that in that case and other civil cases, that this is a pure legal issue, and that it's appropriate to take it away from the jury where it's so conclusive. And that's why our point is that if that's true in the civil context, it's even more important that it be enforced in a criminal context, given the consequences and, you know, the warnings that this Court en banc provided in the Chessman case, that this Court has reiterated in cases like Skelly, that how important it is in a criminal case where we've got due process concerns, notice concerns, that these types of agreements be enforced. We're not talking about, you know, some situation with a retail customer who clicks through on some document nobody ever reads. I mean, this is a totally different context.  Thank you, counsel. Thank you both for your arguments. The matter is submitted. And we turn to our